**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| **vs.** | ) | **MEMORANDUM** |
| | ) | |
| | ) | **No. 6:23-CR-06049-001** |
| **RAYMOND DIPASQUALE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

     **PLEASE TAKE NOTICE,** the defendant, Raymond DiPasquale and his attorney, Gregory Colavecchia, have fully reviewed the Presentence Investigation Report ("PSR") dated June 20, 2023. On April 19, 2023, the defendant waived indictment and pled guilty to a one-count Information charging Possession of Child Pornography Involving a Prepubescent Minor in violation of 18 U.S.C. § 2252A(a)(5)(B) and 18 U.S.C. § 2252A(b)(2) which occurred on or about November 2020, to February 2022. The representations made in this Sentencing Memorandum are based on information and belief, personal interviews with Mr. DiPasquale, the Presentence Investigation Report (PSR), and the following exhibits:

## EXHIBITS

**EXHIBIT A:** Character Reference Letters on behalf of Mr. DiPasquale;

**EXHIBIT B:** Risk Assessment Conducted by Carl Christensen, LCSW-R, dated March 10, 2022, and Progress Report Letter, dated October 19, 2022;

**EXHIBIT C:** Mr. DiPasquale's Personal Statement.

## RELEVANT FACTS

1.    Raymond DiPasquale is a fifty-seven (57) year-old male. He was born on November 10, 1965, in Columbus, OH. He is the son of Charles DiPasquale, age eighty (80), and Mary DiPasquale, age eighty (80). Raymond DiPasquale is the oldest of four children (two brothers, Charles, age fifty-four (54), and David, age forty-six (46), and one sister, Nicole, age forty-eight (48)). Mr. DiPasquale graduated from Genesee Community College, where he met his wife, Kimberly, age fifty-eight (58). The couple have been married since 1987 and had two children, Ryan, age thirty-three (33), and Brandon, age thirty-one (32). Mr. and Mrs. DiPasquale have remained married for the last thirty-six (36) years and reside together in Conesus, NY.

2.    The evidence presented by the Government shows that on or about November 14, 2020, the National Center for Missing and Exploited Children (NCMEC) received a cyber-tip from Yahoo Inc. The tip indicated that on November 10 and 11, 2020, username 'howie paul' emailed suspected images of child pornography to itself using the email address 'xterrafleet@yahoo.com' using an IP address later determined to be Mr. DiPasquale's. On November 11, 2020, agents from the Department of Homeland Security Investigations confirmed that these images met the federal definition of child pornography. On February 16, 2022, New York State Police executed a search warrant authorizing the seizure of electronic devices contained within Mr. DiPasquale's residence. Mr. DiPasquale was arrested during the execution of the warrant and several electronic devices were seized and sent to the New York State Police Computer Crimes Unit for analysis. Both Mr. DiPasquale's iPhone and Lenovo laptop were found to contain approximately 598 images and 161 videos of child pornography. Both the email address 'xterrafleet@yahoo.com' and username 'howie paul' were also found to be used on these devices. On September 30, 2022,

Mr. DiPasquale was arrested by the New York State Police and charged in Livingston County with three (3) counts of Possession of a Sexual Performance by a Child (PL § 263.16). On October 13, 2022, Mr. DiPasquale was charged, by criminal complaint, in the United States District Court for the Western District of New York. Mr. DiPasquale voluntarily surrendered, was arraigned before the Honorable Mark W. Pedersen on November 4, 2022, and placed on pretrial release on or about November 4, 2022. He remains under the supervision of U.S. Probation Officer Jillian M. Trahms. Upon information and belief, Mr. DiPasquale has been compliant with all the terms and conditions of his supervision.

3.     On April 19, 2023, Mr. DiPasquale waived indictment and entered into a plea agreement to a single count Information charging a violation of 18 U.S.C. § 2252A(a)(5)(B) and 18 U.S.C. § 2252A(b)(2). He was permitted to remain under the supervision of the U.S. Probation Department pending sentencing.

4.     Given Mr. DiPasquale's total offense level of twenty-eight (28) and criminal history category of I, his guideline imprisonment range is 78 months to 97 months.

## INITIAL COMMENTS

5.     The sentencing guideline range for the Possession of Child Pornography is some of the most serious. Discussion of the federal guideline range in child pornography cases continues to be spirited. The reality of the harshness of sentencing in child pornography cases was squarely addressed by the Second Circuit in United States v. Dorvee, 604 F.3d 84 (2d Cir. 2010), and several subsequent decisions.

6.     Congress has repeatedly increased the guideline range for child pornography cases since 1991. In February 2013, the sentencing commission released a report to Congress indicating that the

sentencing guidelines for possession of child pornography are outdated. See *U.S. Sentencing Commission Report to the Congress: Federal Child Pornography Offenses (2012)*. The commission indicated that the widespread use of the internet and the type and quantity of the images has made enhancements widespread, which is inappropriate. *Id*, at 209, 323. The commission also indicated that the type of material that is largely available would qualify for nearly all enhancements. *Id*, at 84 - 92. Overall, the Commission Report suggests that the base level offense and typical enhancements can lead to unreasonably harsh sentences.

7.  An updated 2021 Sentencing Commission Report based on data from 2019 ([https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf](https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) ), indicates that many enhancements apply to most people charged under 2g2.2, and cease to perform their stated purpose to distinguish offenders by their culpability. Some key findings of this Sentencing Commission Report show that these numbers are continuing to increase with respect to the outdated use of enhancements:

I. **Facilitated by advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims.**

- In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos.

- Over half (52.2%) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4%) included prepubescent victims.

4

II. **Constrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, §2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements— accounting for a combined 13 offense levels—cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.**

- In fiscal year 2019, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12).

- The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases.

III. **Because enhancements that initially were intended to target more serious and more culpable offenders apply in most cases, the average guideline minimum and average sentence imposed for nonproduction child pornography offenses have increased since 2005.**

- The average guideline minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019.

IV. **Courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender.**

- In fiscal year 2019, less than one-third (30.0%) of non-production child pornography offenders received a sentence within the guideline range.

- The majority (59.0%) of nonproduction child pornography offenders received a variance below the guideline range.

5

- Non-government sponsored below range variances accounted for 42.2 percent of sentences imposed, and government sponsored below range variances accounted for 16.8 percent.

8.    Based on these outdated enhancements, which have little-to-no basis in empirical research, judges have routinely disagreed with the use of such enhancements and have issued non-guideline sentences.

## A REDUCTION OUTSIDE THE GUIDELINE RANGE

9.    Judges are invited to consider arguments that the applicable guidelines fail properly to reflect within the scope of 18 U.S.C. § 3553(a). As recognized in Rita v. United States, 551 U.S. 338, 351, 357 [2007], examples of these arguments may be that: the guidelines reflect an unsound judgment, do not generally treat certain defendant characteristics in the proper way, or that a different sentence is appropriate regardless.  Indeed, Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough v. United States, 552 U.S. 85, 101 (2007).

10.    Child pornography guidelines are based primarily on congressional directives, rather than empirical research. To be sure, United States v. Dorvee, 616 F.3d 174, 184, 188 (2d Cir. 2010) concluded that § 2G2.2 is beset with "irrationality" to such a degree that "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires," and advising generally "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2-ones that can range from noncustodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of

highly unusual provenance which, unless carefully applied, can easily generate unreasonable results."

11.    Paragraph 14 of Mr. DiPasquale's plea agreement states, "The government and the defendant . . . reserve the right to recommend a sentence outside the Sentencing Guidelines range . . . This paragraph reserves the right to the government and the defendant to bring to the attention of the Court all information deemed relevant to a determination of the proper sentence in this action." Therefore, a non-guideline sentence is permissible pursuant to the plea agreement.

12.    It is worth considering too that there is "essentially no limit to the number of factors that may warrant a departure." *Koon v. United States*, 518 U.S. 81, 106 (1996). 18 USC § 3553(a) delineates the factors that should be considered in sentencing. The statute further states that the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.  For this reason, Mr. DiPasquale submits that the sentencing factors outlined in 18 U.S.C § 3553 suggest that a reduction outside the guideline is appropriate in this case.

## HISTORY AND CHARACTERISTICS OF MR. DIPASQUALE

HISTORY:

13.    At the onset, it is worth mentioning that Mr. DiPasquale served honorably for thirty-two (32) years in law enforcement with both the Livingston County Sheriff's Department and the Greece Police Department, before his retirement in 2019. Notably, Mr. DiPasquale recognizes that his thirty-two (32) years of honorable service does not excuse him from taking full responsibility for his actions. To the contrary, Mr. DiPasquale has noted on several occasions that, especially as a former police officer and public servant, he is both embarrassed and ashamed of his behavior.

7

14.     To be clear, none of Mr. DiPasquale's criminal conduct occurred while he was employed as a police officer. Additionally, no allegations have ever been made against Mr. DiPasquale during his time as a police officer. As is reflected in the Presentence Investigation report, Mr. DiPasquale maintained a stellar career over his entire thirty-two (32) years of service.

15.     Throughout Mr. DiPasquale's early childhood, he reports a close, supportive, and loving relationship with his parents, Charles and Mary DiPasquale.

16.     Mr. DiPasquale's father, Charles, was an active member in his local community of Mount Morris, NY, where he served as the Police Chief for over thirty-six (36) years and taught a criminal justice class through public school at Charles G. May Career & Technical Education, in Mount Morris, NY.

17.     Mr. DiPasquale's mother, Mary, found her career in addressing the needs of the intellectually disabled. Both Mr. DiPasquale's parents have since retired.

18.     Mr. DiPasquale recalls maintaining good grades and academic progress throughout his education despite being diagnosed with dyslexia at the approximate age of fourteen (14).

19.     Mr. DiPasquale participated in boy scouts, chorus, band, soccer, swimming, track, and enjoying annual vacations and frequent camping trips with his family.

20.     Although Mr. DiPasquale's early childhood development may seem unremarkable on the surface, he did experience several instances throughout his teenage years that were marked by unresolved trauma.

21.     While Mr. DiPasquale was attending St. Patrick's Catholic School, he served as an altar boy for St. Patrick's Church. During his time at St. Patrick's, Mr. DiPasquale became close with a teacher who would help Mr. DiPasquale with his homework after school. What started out as a

supportive academic relationship quickly developed into a predatory one once Mr. DiPasquale spent the night at this teacher's home.

22.   Once inside the teacher's home, Mr. DiPasquale was touched inappropriately on his feet and thighs by the teacher and ordered to take a shower. The teacher proceeded to "help" Mr. DiPasquale undress and watched him shower. After showering, Mr. DiPasquale was told by the teacher that it was time for bed and that Mr. DiPasquale would be sleeping with him. Once in bed, the teacher "cuddled" with Mr. DiPasquale from behind and began fondling Mr. DiPasquale's genitals and rubbing his genitals against Mr. DiPasquale's buttocks.  There is little doubt that this traumatic incident has left lasting psychological and emotional effects on Mr. DiPasquale.

23.   Approximately one (1) year later, when Mr. DiPasquale was fifteen (15) years old, he found himself in a similar situation with his swim coach. After swim practice one evening, Mr. DiPasquale and his swim coach sat together on a spectator's bench. The coach told Mr. DiPasquale to lie down on the bench and proceeded to massage Mr. DiPasquale's upper thighs and genitals. Mr. DiPasquale admits that he buried these two traumatic events deep within himself and attempted to forget that they ever happened.

24.   After Mr. DiPasquale earned his high school diploma, he attended college for one year at Springfield Technical Community College. Mr. DiPasquale then transferred to Genesee Community College where he ultimately earned his associate degree in criminal justice. Notably, this is where Mr. DiPasquale also met his wife, Kimberly.

25.   After working as a security guard for several employers, Mr. DiPasquale began his thirty-two (32) year career as a police officer with the Livingston County Sheriff's Department in 1987.

26.     In 1999, Mr. DiPasquale transferred to the Greece Police Department, where he would later retire from in 2019.

27.     Importantly, in 2002 Mr. DiPasquale received major back surgery and was unable to work for approximately one (1) year. During this time, when Mr. DiPasquale struggled with his weight and deteriorating physical health, he decided to make a serious lifestyle change to better preserve his health and fitness. What began as a few short distance runs quickly grew into an obsession with fitness. Mr. DiPasquale would go on to complete numerous marathons, two 50-mile races, and four ironman competitions. He went on to develop and nurture long-lasting relationships with members of his local CrossFit gym, which became a large part of his life.

28.     For the last seven (7) years of his career with the Greece Police Department, Mr. DiPasquale became heavily involved in union work for his department and even served as union president.

29.     Shortly before Mr. DiPasquale's retirement, he and his family experienced a chain of emotionally taxing events that left Mr. DiPasquale physically exhausted and emotionally depressed.

30.     Both Mr. DiPasquale's father and father-in-law were diagnosed with Parkinson's disease. This meant that Mr. DiPasquale and his wife, Kimberly, needed to dedicate most of their free time to ensuring that their parents' basic needs were met. Often these needs took the form of regular showers, shaving, haircuts, cleaning their homes, changing soiled underwear, and providing transportation and support during regular doctor's visits, and blood work.

31.     During this time too, Mr. DiPasquale's sister-in-law was diagnosed with breast cancer, which placed even more pressure on the DiPasquale family to be present, supportive, and accommodating.

10

32.    Compounding matters even further, Mr. DiPasquale experienced two concussions as well as a knee injury that prevented him from participating in both individual and group exercise and from returning to his community of CrossFit athletes. This also meant that his health and physical fitness, that he worked so hard to preserve, began to decline. With this decline, Mr. DiPasquale also began experiencing feelings of depression.

33.    As Mr. DiPasquale's father's medical condition worsened, his father-in-law passed away in December of 2020, and his sister-in-law passed away from her battle with breast cancer in October of 2021. Mr. DiPasquale found himself overwhelmed, overburdened, and, in his own words, "spiraling out of control."

34.    Mr. DiPasquale's father's health condition has continued to worsen, now at Stage IV Parkinson's Disease, and it is likely that he is living out his final days.

35.    It is worth noting too that Mr. DiPasquale's wife, Kimberly, has ongoing medical conditions that hinder physical intimacy. Unwilling to accept the advice of friends and seek out professional care for his anxiety and depression, Mr. DiPasquale withdrew deeper into his feelings of dejection and sought out pornography as a means of escape.

36.    On February 16, 2022, immediately following the execution of the search warrant on Mr. DiPasquale's home, he has been actively attending and participating in individual therapy and group treatment sessions with two (2) different providers including North Cost Counseling, and RKKS Mental Health Counseling.

37.    Mr. DiPasquale is a volunteer at Lagum Landing, where he helps remodel a home and support their maple syrup business. He also regularly attends West Bloomfield Congregational Church.

<u>CHARACTERISTICS OF THE DEFENDANT:</u>

38.    Mr. DiPasquale has had no previous contact with the criminal justice system. He has led an exemplary life of compassion and service to others. He is the beneficiary of an enormous circle of family and friends determined never to give up on him. So as not to belabor the record, it is a common practice of mine to submit only a limited number of character reference letters. In Mr. DiPasquale's case, however, I found that by excluding any one of these letters would mean depriving the Court the opportunity to fully appreciate both the extent to which Mr. DiPasquale would go in the service of others, and the dignified manner in which he accepted and disclosed his guilt to everyone around him. Certainly, Mr. DiPasquale could have avoided the repeated embarrassment of explaining his actions to everyone around him. Instead, Mr. DiPasquale chose to meet with every single person in his life and explain what he had done – these must have been heart wrenching conversations for everyone involved. The willingness to pursue these difficult, embarrassing, and mentally exhausting conversations speaks volumes to his character. Even after having the difficult conversations and being aware of the charges against him, these individuals made a conscious decision to submit a letter to this Court on his behalf. These letters of reference, attached as **EXHIBIT A**, indicate that everyone in Mr. DiPasquale's circle is there to support him unconditionally. It would be impossible to chronicle their support of Mr. DiPasquale without these heartfelt statements:

Kimberly DiPasquale – Wife:

      i.    [O]ur commitment to have each other at the worst times is unwavering. I know in my heart that Ray is still at that amazing person I married despite the mistakes he has made.

ii.    Ray goes to Mt Morris at least five days a week to clean and shower his dad. At times he will sleep there in order to be able to help when his dad gets up throughout the night.

iii.    . . . Ray has become a different man. He has taken responsibility and continues to do so for his actions . . .

iv.    As difficult as it was, I watched him go to the neighbors and family to discuss what happened.

v.    . . . Ray has learned a great deal from the past year and has a plan on moving forward and growing from this experience. Ray is an amazing father and husband. We both know this won't be easy, but I know with continued therapy and the support we have we will both continue to move forward, and be each other's rock.

**Brandon DiPasquale – Son:**

i.    Since this process began, I have seen my dad in the worst position he's ever been in, and I have also watched him rebuild himself, make amends, and get the help he needs to dig himself out of this hole he fell into.

ii.    A memory that I will always be thankful for and hold close to my heart was a day I was the most frightened I have ever been. That day was the day I came out as gay. I started to have a panic attack about coming out to my mother and father. I knew they would accept me, but I still had the fear in the back of my mind that they might unexpectedly react negatively to what I had to say. When I told my parents, my dad looked at me, came over and gave me the biggest hug I have ever received. He asked me, "Are you happy?" The answer was "yes" and he responded with "That is all that matters to us."

iii.    When he first met my partner, the first thing he did was give him a hug. It made my partner feel welcomed and from there on they grew a relationship where my dad reaches out to him on his own without me because he genuinely cares about him.

iv.    Despite my dad's mistakes, it is impossible for me to judge my dad's character or challenge his intentions because of how he puts everyone before himself.

**Ryan DiPasquale – Son:**

i.    . . . [W]hen my brother and I were younger, my parents sat us both down and told us that we were going to be having a coworker of my father and her 3 kids stay with us for a while as she had no one else to depend upon. I later found out that my father

had her stay with us to help her get out of an abusive and dangerous relationship. I always knew him to be a great dad, but from that moment on, I realized he is more than that . . .

ii.    Over the past year, I have witnessed my dad open up and finally allow his family to help him the way he has helped all of us.

iii.   I have been watching my father tackle his depression, anxiety and stress head on through the help of his group and individual counseling, and his family, both biological and found.

Nicole Davis – Sister:

i.    Ray has always been a humble human being, and has always focused on service. His service was not only towards family and friends, but to co-workers, community and to those he doesn't know well. He is kind and compassionate and has always put the needs of others before his own.

ii.   He has taken full accountability for his actions and he has been steadily and fiercely working on getting himself healthy, engaging in both individual and group counseling of his own accord. He is wholeheartedly remorseful and is making amends.

Janet Evans – Friend:

i.    Ray is a giver. He's happiest when he's helping someone.

ii.   The way so many people have rallied around Ray is a testament to his character. So many family members and friends are supporting him during this trying time, as he has supported us during ours.

iii.  As we watched him interact with his wife and children . . . I was reassured that my boys would have a wonderful example of what a good healthy relationship looks like, between a husband and wife and father and sons. Ray is like a second father to my boys.

Brian Davis – Brother-in-law:

i.    I see Ray several times a week and he never passes me, without apologizing for his decisions.

ii.   A few short months ago, on December 5, 2022, my wife and I were informed by local law enforcement that our oldest son (Jordan) was discovered deceased in his Warsaw, NY apartment due to Type 1 diabetic complications. Ray was the first sibling (on either side of our family) to be at our house and by our side as we tried to navigate this tragedy. Ray

14

escorted my wife and I over to our son's apartment and ushered me inside to see my son and confirm his identity prior to the funeral director arriving. As I collapsed beside his body on the floor, in disbelief; Ray held me in his arms.

iii.    Ray set aside his entire life, all his stress, embarrassment, anxiety, etc.... so he could comfort us in our time of need. His presence then and his daily communication since, has allowed and continues to allow my wife and I to begin healing from the loss of our son.

Charles and Mary DiPasquale – Parents:

i.    He has spent many years and dedicated himself to public service and helping others. He has been like this his whole life. He is the person we all know we can count on if we are in need.

ii.    He comes to our home every day to care for us and also takes us to our appointments. We really don't know what we would be doing without him. He is patient, supportive, and has dropped everything to help us in order for us to continue to live in the home we worked so hard for all of our lives.

iii.    . . . Raymond is not only a great son, he is a great man. We are so proud of him. We do realize the significance of his charges. He is remorseful. We truly believe this . . . . He is taking responsibility and is holding himself accountable.

39.    To be sure, each of the thirty-two (32) letters attached to this memorandum describes Mr. DiPasquale's character as an enormous and axiomatic presence in their life. Indeed, the sheer volume of letters alone could be taken as not just a mere reflection of the sentiment of family and friends, but of the community as a whole.

40.    Mr. DiPasquale's actions were entirely out of character. His actions were not consistent with his personality or the life he has led over the last fifty-plus years. He has always been a good husband, father, son, friend, and community member. In light of the support he has received, Mr. DiPasquale wishes he had sought help. However, since his arrest Mr. DiPasquale's relationships have only strengthened and improved -- a silver lining which he is grateful for.

41.     Mr. DiPasquale's case has received significant news coverage due to his status as a former

police officer. Importantly, in light of the news coverage, there have been no prior or subsequent

allegations of inappropriate behavior by Mr. DiPasquale. In addition, there are no allegations of

financial profit or production. Mr. DiPasquale's history and characteristics developed over the

fifty-plus years of his life may be the single most important factor in considering an appropriate

sentence.

## TREATMENT AND CLINICAL ASSESSMENT

42.     On February 16, 2022, the day the New York State Police executed a search warrant at Mr.

DiPasquale's home, Mr. DiPasquale contacted Carl Christensen, LCSW-R of North Coast

Counseling, and made an appointment to begin treatment. Mr. DiPasquale actively participates in

individualized treatment and group therapy sessions with Mr. Christensen.

43.     When making risk assessment determinations, professionals in the field of sexual offending

use multiple tools and do not limit themselves to an actuarial risk assessment.  Their assessments

include extensive interviewing of the individual, extensive documentary review of the

individual's history, mental health and criminal history, administering structured professional risk

instruments, additional testing, and exercising clinical judgment.  Clinical professionals who do

risk assessments follow standard practices intended to produce the most accurate possible

determinations.

44.     Attached as **EXHIBIT B**, in a report dated March 10, 2022, Mr. DiPasquale participated in

an evidence-based risk assessment evaluation with Carl Christensen, LCSW. Mr. Christensen has

more than thirty-five (35) years of experience evaluating and treating people who have committed

sexually based offenses.

16

45.    The assessment follows the Risk-Needs-Responsivity Model utilizing the actuarial risk assessments for non-contact offenders (pornography, exhibitionism, unlawful surveillance), and are assessed using the STABLE 2007, Child Pornography Offender Risk Tool (CPORT), and Correlates of Admitted Sexual Interest in Children (CASIC). The scores are combined and reported as 5 categories of risk. Mr. Christensen placed Mr. DiPasquale in "Category 1, Very Low Risk."

46.    Mr. DiPasquale was open, honest and truthful during this evaluation. Mr. Christensen made the following comments in his report:

    i.    Principally, Raymond needs mental health treatment for coping with the circumstances of his legal situation and to recover a more stable sense of himself and reduce his level of distress.

    ii.    There are no particular criminogenic needs noted and he is a very earnest and forthright individual.

    iii.    Raymond's responsivity has been excellent and he reports that talking about this with me has been very helpful to him as he copes with the situation.

Exhibit B, p. 4.

47.    In a letter dated October 19, 2022, Mr. Christensen provided an update on Mr. DiPasquale's treatment progress. Mr. Christensen indicated that:

> [Mr. DiPasquale] began treatment in May of 2022 and has attended all sessions. He has been an active member of the therapy group, has opened up considerably about his feelings and exploring the factors that contributed to his use of pornography. His risk continues [to be] low and I believe he is an excellent candidate for community supervision and outpatient treatment.

Exhibit B.

48.     More recently, during my email communications with Mr. Christensen on April 14, 2023, he noted again that: "I fully support your recommendation he stay out of custody. He is doing very well in group, continues to share his thoughts and feelings and is good support to others in the group. I have 3 new clients starting group next week and he could be a help in giving them a good start."

49.     Importantly, this is not the only treatment that Mr. DiPasquale is receiving. On December 5, 2022, Mr. DiPasquale began treatment with Rebecca Kistner through a referral by Pretrial Services at RKKS Mental Health Counseling. As noted in the Presentence Investigation Report, p. 18, Mr. DiPasquale "has been compliant with treatment, is working toward his treatment goals, and participates in his sessions."

50.     Minimally, Mr. DiPasquale's immediate and continued willingness to seek out and actively participate in treatment exemplifies his dedication and eagerness to change. A reasonable sentence would, therefore, allow Mr. DiPasquale to make a prompt return to treatment and avoid a protracted period of time away from the support and guidance he has found there. Indeed, Mr. DiPasquale, his wife, and his family have all maintained that their relationship is better now than it has ever been since Mr. DiPasquale has been participating in treatment.

51.     Additionally, I will provide to the Court an updated treatment letter from Carl Christensen prior to sentencing.

**INTROSPECTION INTO THE OFFENSE**

52.     Mr. DiPasquale's immediate response to accept responsibility for his actions and willingness to be honest, open, and upfront about his behavior to everyone around him, sets him apart from

most defendants. Despite the humiliation and embarrassment of being honest and open about his

behavior, Mr. DiPasquale exposed his conduct to everyone he knew. This could not have been

easy. Still, he confronted each of these conversations head on. What is even more impressive,

however, is that Mr. DiPasquale makes no mention of having these conversations in his personal

statement to this Court. This small but significant detail shows that Mr. DiPasquale was not

seeking some sort of leniency or recognition by this Court when he accepted responsibility for

his actions. Instead, Mr. DiPasquale's willingness to be honest and open, and accept

responsibility for his crimes is a reflection of the value he places on his own integrity.

53.     Nevertheless, Mr. DiPasquale's personal statement to this Court, attached as **EXHIBIT C**,

makes clear that he takes complete responsibility for his actions and is fully aware of the extent

of damage his decisions have caused to his victims, his family, his friends, and his community.

54.     Specifically, Mr. DiPasquale noted that:

> I will always own what I did and never stop taking responsibility. Being
> a former police officer, I fully understand the impact my actions had on
> the children in those images. Not only did these children suffer when
> they were abused by the photos taken of them and made to do
> unspeakable lewd things for those photos. Moreover, I realize that I too
> added to their pain and suffering.

55.     Through his treatment, Mr. DiPasquale has been able to identify what led him to his offense,

how to address those issues, and how to make sure that it never happens again.

### RELEVANT CASE AUTHORITY

56.     In a similarly situated case that came before this Court and Your Honor for sentencing on

January 3, 2019, defendant Richard Wolfe plead guilty to a single count of Possession of Child

Pornography in violation of Title 18 USC § 2252A(a)(5)(B). See US v. Wolfe, case no.: 6:18-CR-6082. Specifically, the factual predicates of this case bear repeating here.

57.    In *Wolfe*, the defendant, who was also a first time offender, maintained possession of approximately 115,000 images of child pornography; did not have any direct inappropriate contact with minors; did not involve the production of child pornography; immediately sought out sex offense treatment and was assessed as a low risk to reoffend; was granted pretrial release and complied with all the terms and conditions thereof; had been married for over three (3) decades and had two (2) children; demonstrated that he had a plan in place once he was released and the community support necessary to carry out that plan; demonstrated remorse for the continued abuse of his victims; was given a total offense level score of twenty-eight (28); and, was subject to a sentencing range of 78-97 months of incarceration.

58.    *Wolfe* departs from the instant case only in that he had a history of frequent use of alcohol and possessed over 100,000 more images. Outside of this, Mr. DiPasquale's case bears a striking resemblance. Importantly, this Court in *Wolfe* found that a downward variance to a sentence of twelve (12) months and one (1) day was a sufficient period of incarceration to deter the defendant and others from engaging in this type of activity in the future.

## CONCLUSION

59.    Mr. DiPasquale has actively embraced this experience as an opportunity for personal growth and transformation, demonstrating a sincere commitment to change the behaviors that led to the present offense. Instead of evading accountability, he confronted it head-on, engaging in numerous difficult conversations with his loved ones. His lifelong track record as a dependable

friend, husband, father, co-worker, mentor, and son is a testament to his character and the impact he has had on those around him.

60.  It is important to note that Mr. DiPasquale fulfills the role of primary caretaker for his father, who is in the advanced stages of Parkinson's disease with a limited life expectancy. The well-being of his elderly parents relies heavily on his daily support and attention.

61.  Moreover, Mr. DiPasquale's wife, with whom he has shared a committed marriage of thirty-six (36) years, has unequivocally expressed her unwavering support for her husband. Notably, their relationship has undergone a renewal and strengthening since Mr. DiPasquale's arrest.

62.  Mr. DiPasquale makes no excuses for his possession of child pornography, and he deeply regrets his actions. In a personal letter to the Court, he expresses remorse and acknowledges the profound impact on his victims.

63.  In his journey towards rehabilitation, Mr. DiPasquale has responded exceptionally well to treatment, emerging as an inspirational mentor to others who admire his positive attitude and psychological resilience. He has transitioned from being part of the problem to actively contributing to solutions. Importantly, he has identified the factors that led to offense and addressed them with sincerity.

64.  Mr. DiPasquale is genuinely ashamed, embarrassed, and remorseful for his actions. The intervention of the federal criminal justice system, which he has experienced since the police knocked on his door over a year ago, may have been the necessary catalyst for him to redirect his life positively. His behavior since the arrest demonstrates the transformative effect of this process.

65.     The gravity of Mr. DiPasquale's actions is indisputable; he accepts his guilt and must be sentenced.  While non-custodial sentences are rare, there are instances when they are justified. Congress, in its crafting of 2g2.2, anticipated the possibility of defendants meriting such sentences.

66.     Above all, Mr. DiPasquale has expressed a plan for the future with the support of his loved ones. Because both Congress and the Second Circuit recognize that some defendants are worthy of a non-custodial sentence, and considering Mr. DiPasquale's personal history, unique characteristics, and the totality of the circumstances, we respectfully submit that his case would be suitable for a non-custodial sentence. Should the Court be inclined to issue a custodial sentence, we respectfully request a sentence of six months imprisonment followed by six months of home confinement and a period of supervised release deemed appropriate by the Court.

Dated: July 7, 2023                           Respectfully submitted,

Greg Colavecchia, Esq.
Attorney for the Defendant
650 Clinton Square
Rochester, NY 14604
585-270-8888
greg@robertkinglawfirm.com